FILED

AUG 1 1 2005

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

UTSTARCOM, INC.,                                          )          Case No.: C -04-1122   PVT
                                                         )
                    Plaintiff,                           )          **ORDER RE: CLAIM CONSTRUCTION
                                                         )          OF UNITED STATES PATENT NO.
          v.                                             )          6,628,671**
                                                         )
STARENT NETWORKS CORP.,                                  )
                                                         )
                    Defendant.                           )
                                                         )

## I.    INTRODUCTION AND FACTUAL BACKGROUND

The proper construction of  U.S. Patent No. 6,628,671 ("the '671 patent") is currently before

the Court. Plaintiff UTStarcom, Inc. ("UTStarcom") alleges that Defendant Starent Networks Corp.

("Starent") infringes claims 1 and 2 of the '671 patent by making and selling the ST-16 Intelligent

Mobile Gateway device (the "accused device.")

The '671 patent involves a communications device (or mobile unit), such as a laptop or cell

phone, accessing a network using a point-to-point protocol ("PPP").  PPP is a protocol or standard

originally designed to allow dial up access to the internet, but also used to allow wireless access to

the internet.  The accused device is a "Network Access Server", a computer server that allows for

wireless devices to connect to the internet.  The patent also refers to the network access server as an

//

United States District Court
For the Northern District of California

1  IWU.[1]  The network access server translates between the wireless protocols used by radio equipment

2  and the packet protocols used by the internet.  (Francis PI Decl. ¶ 14.)  The wireless device connects

3  through a radio tower to a Base Station and a Central Base Station Controller ("CBSC").  The CBSC

4  interfaces between the radio tower and the network access server.  The connection between the Base

5  Station and the network access server is called a frame relay interface.[2]

6  Information enters the network access server from the frame relay on a  T1 line that connects

7  to one of four physical ports on a Quad T1 card.  The Quad T1 card links  up to a "system bus" that

8  allows all of the pieces of the network access server to communicate with each other.  The

9  information then passes to an MCP ("Mobile Call Processor") card.  The MCP card forwards PPP

10  packets over the system bus to a MARC ( "Mobile Access Router Card").  The MARC card is where

11  PPP state is stored and higher level protocol processing is done to allow for routing packets over the

12  internet.  (Ennis Decl. ¶ 12.)  The MARC card sends and receives packets to and from the internet

13  through a Dual Ethernet NIC card.  (See also figure 2 of the '671 patent.)  In the preferred

14  embodiment of the patent, each MARC card can support a number of MCP cards.  ('671 Patent Col.

15  10 lines 43-46.)[3]

16  A "Negotiation" or exchange of information establishes parameters for the transmission and

17  reception of data packets between a mobile unit and a Network Access Server.  The information

18  resulting from the negotiation is called "PPP State."  (Francis PI Decl. ¶ 17.)  "PPP state" is "a set of

19  parameters negotiated pursuant to PPP sufficient for a PPP session." (Jt. Claims Construction Chart

20  at 1.)  A "PPP Session" is the time during which a communications device and a network access

21  server are maintaining a negotiated PPP state.  (Id.)

22  //

23  _____

24  [1]  The technology is now in "3G" or Third Generation Technology.  In the 3G terminology the Network Access Server is known as  a "PDSN" a Packet Data Serving Node.  (Francis PI Decl. ¶ 36.)

25  ("Francis PI Decl." refers to the declaration of Dr. Paul T. Francis submitted by UTStarcom in support of its motion for Preliminary Injunction.)

26  [2]In 3G technology, the Base Station and Central Base Station Controller have been replaced by

27  a "PCF" or Packet Control Function and the connection between the PCF and the network access server is now an "R-P Session."  (Francis PI Decl. ¶¶ 27,  31.)

28  [3]All further references to patent columns and lines are to the '671 patent unless otherwise noted.





Claim 1 and dependent Claim 2 of the '671 patent state:

1. A method of connecting a communications device to a packet switched network, comprising the steps of:

initiating a Point-to-Point Protocol (PPP) session between said device and a network access server, said network access server providing access to said packet switched network for said device, said session associated with a PPP state and with a first port in said network access server, wherein said PPP session thereafter becomes dormant but said PPP state is not removed from said network access server;

receiving, after said PPP session has become dormant, at said network access server a new call set-up message associated with said device, said new call set-up message arriving at a second port in said network access server;

switching said PPP state from said dormant PPP session associated with said first port to a session associated with said new call set-up message associated with said device at said second port,

wherein said PPP state is transferred to said session associated with said new call set-up message and the negotiation of link control protocols or network control protocols between said device and said network access server may be avoided.

2. The method of claim 1, wherein said PPP session becomes dormant due to movement of said device relative to a first radio tower linking said device to a wireless communications network, and wherein said new call set-up message is initiated in response to said device coming within range of a second radio tower in said wireless communications network.

(Col. 18 line 52 - Col. 19 line 16.)

The dispute involves the process by which a wireless device re-connects to the internet after going "dormant," a state in which there is no active data transfer. UTStarcom claims that, in the prior art, when calls went dormant the re-connection required "renegotiation of PPP state." The patented invention covers a means to hand-over between the two connections to provide the user with uninterrupted access to the internet. The '671 patent describes a means to store PPP state information in the memory of the network access server when the device was not sending or receiving information and switching the PPP state to the new, active session.

The Court held a claim construction hearing on June 30, 2005.

## II.    LEGAL STANDARDS

Claim construction is a matter of law for the court, which is empowered and obligated to construe the meaning of the language used in the patent claim. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995)(en banc), aff'd, 517 U.S. 370 (1996). In interpreting disputed

1  claim terms, the court should look first to the intrinsic evidence of record. <u>Vitronics Corp. v.</u>
2  <u>Conceptronic, Inc.</u>, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Intrinsic evidence includes the language of
3  the claims, the specification, and the file history, if in evidence. <u>Id.</u>

4  "Claim language generally carries the ordinary meaning of the words in their normal usage in
5  the field of invention" at the time of invention. <u>Invitrogen Corp. v. Biocrest Mfg., L.P.</u>, 327 F.3d
6  1364, 1367 (Fed. Cir. 2003); <u>CCS Fitness, Inc. v. Brunswick Corp.</u>, 288 F.3d 1359, 1366 (Fed. Cir.
7  2002) (There is a "'heavy presumption' that a claim term carries its ordinary and customary
8  meaning.") A court determines the meaning of a technical term in a patent claim "in accordance
9  with its usage in the specification, elaborated if appropriate by the prosecution history and with due
10  consideration to usage in the field of the invention." <u>Norian Corp. v. Stryker Corp.</u>, 363 F.3d 1321,
11  1326 (Fed. Cir. 2004). Dictionaries can be helpful in ascertaining the plain and ordinary meaning of
12  claim language. <u>Texas Digital Sys., Inc. v. Telegenix, Inc.</u>, 308 F.3d 1193, 1202 (Fed. Cir. 2002).
13  However, the Federal Circuit recently clarified the roll of dictionary definitions in claim
14  construction, finding that the <u>Texas Digital</u> line of cases too often has been "improperly relied upon
15  to condone the adoption of a dictionary definition entirely divorced from the context of the written
16  description." <u>Phillips v. AWH Corp.</u>, ---- F.3d ----, 2005 WL 1620331 at *14

17  (Fed. Cir. July 12, 2005) (en banc). The Federal Circuit explained that: "The problem is that if the
18  district court starts with the broad dictionary definition in every case and fails to fully appreciate how
19  the specification implicitly limits that definition, the error will systematically cause the construction
20  of the claim to be unduly expansive." <u>Id.</u>

21  The Federal Circuit reaffirmed that the specification is the "single best guide to the meaning
22  of a disputed term" and "acts as a dictionary when it expressly defines terms used in the claims or
23  when it defines terms by implication." <u>Phillips</u> at *13, <u>quoting</u> <u>Vitronics</u>, 90 F.3d at 1582. The
24  Federal Circuit cautioned that starting with a broad dictionary definition and requiring explicit
25  narrowing in specification is inconsistent with its prior rulings. <u>Phillips</u> at *13, <u>citing</u> <u>Bell Atl.</u>
26  <u>Network Servs., Inc. v. Covad Comms. Group, Inc.</u>, 262 F.3d 1258, 1268 (Fed. Cir. 2001) ("[A]
27  claim term may be clearly redefined without an explicit statement of redefinition.")

28  The challenge still remains to use the specification properly. "On the one hand, claims 'must

United States District Court
For the Northern District of California

be read in view of the specification, of which they are a part.' On the other hand, it is improper to read a limitation from the specification into the claims." Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 904-05 (Fed. Cir. 2004) (citations omitted.) Where the specification explicitly refers to the invention in a manner that makes clear that the invention is narrower than the claim language might imply, it is "entirely permissible and proper to limit the claims." Alloc, Inc. v. International Trade Commission, 342 F.3d 1361, 1370 (Fed. Cir. 2003). However, the law "does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention." Superguide Corp. V. DirectTV Enters., Inc., 358 F.3d 870, 880 (Fed. Cir. 2004), quoting SRI Intern. v. Matsushita Elec. Corp. of America 775 F.2d 1107, 1121 (Fed. Cir. 1985).

The court may also consider the file history of the patent, if it is in evidence. Vitronics, 90 F.3d at 1582. The file history is often of critical significance in determining the meaning of the claims. Id. Any interpretation that is provided or disavowed in the file history shapes the claim scope. Renishaw PLC v. Marposs Societa' Per Azioni, 158 F.3d 1243, 1249 n.3 (Fed. Cir. 1998). Finally, the court may also consider extrinsic evidence in the form of expert testimony, but should not accept conclusory assertions or expert testimony at odds with the intrinsic evidence. Phillips, at * 10, citing Key Pharms v. Hercon Labs Corp., 161 F.3d 709, 716 (Fed. Cir. 1998).

## III. DISCUSSION

The parties dispute the construction of the following terms: 1) Port: 2) Dormant/Dormant PPP session; 3) Switching/ Transferring; and 4) Session.

### A. Port

UTStarcom asserts that a "port" is "a defined physical or logical connection where data enters or leaves a network device." Starent asserts that "port" is "a physical connection point in a telecommunications device for communication with other devices." (Jt. Claims Construction Statement at 2.) The dispute is whether port is limited to physical connection points or can include logical connections.

The claim language using port is: "said session associated with a PPP state and with a first port in said network access server"; "said new call set-up message arriving at a second port in said network access server"; and "switching said PPP state from said dormant PPP session associated

ORDER, *page 5*

United States District Court
For the Northern District of California

with said first port to a session associated with said new call set-up message associated with said device at said second port." Thus, the claim language uses the word port without referring to physical or logical connections.

     1.  The Specification

   Starent argues that the specification describes only physical ports. UTStarcom disagrees, arguing that the specification also references logical ports. UTStarcom also argues that, more importantly, the specification discloses no intent to limit the definition of port to physical ports.

   Starent points to several places where it argues that the specification refers to physical ports. For example, Starent quotes: "An object of the invention is to provide a method to allow a PPP session to go dormant and then dial back into a different port on the same network access server" without requiring renegotiation. (Col. 2, lines 52-54.) Starent argues that "dial back" is a phrase referencing a physical port. (Ennis PI Decl. ¶ 18, Ennis Decl. ¶ 11.) UTStarcom disagrees, arguing that "dialing" refers to the fact that one end of this communication is a person on a phone and does not refer to whether the data enters the network access server on a physical or logical port.

   Similarly Starent quotes language in the specification that a new call set-up message is received "at a second port in the Network Access Server." (Col. 7 lines 19-20.) Starent offers the opinion of expert Ennis that the claim's use of the phrase "arriving at a port" (Col 18 line 66) "implies physicality since the network access server is piece [sic] of physical hardware having physical ports 'at' which messages arrive." (Ennis Decl. ¶ 10.) However, all the proffered definitions of port involve the concept of entrance or exit point and Starent offers no argument why the network access server could not also have logical ports "at which" messages arrive.

   Starent also points to a reference in the specification to the RS-232 port, a physical port in the network access server that receives a T1 line. (Ennis Decl. ¶ 11, quoting Col. 15 line 6.) This part of the specification describes one embodiment of the invention, when the new call arrives on a T1 interface on the same MCP ("Mobile Call Processor") card in the network access server. The specification states that the "configuration database can also be modified through different mechanisms" including "Local command line interface over RS-232 port on the MCP network interface card." (Col. 15 lines 3, 6.)

1    UTStarcom argues that the specification also references "port" in a manner that suggests a
2  software construct or logical port. UTStarcom points to the following language relating to the
3  process in the preferred embodiment when the device comes into range of a new tower and a new
4  call set-up message is sent to the network access server: "The new call set-up message is assigned to
5  a certain port in the second network access server." (Col. 8 lines 24-25.) UTStarcom argues that
6  "assigned" suggests a logical port as opposed to a physical port.

7    UTStarcom also argues that the description of embodiments in the patent states "Each card is
8  configured to receive four T1 digital telephone lines, comprising twenty four time division
9  multiplexed channels" refers to a logical port (Col. 9 line 67- Col. 10 line 2). Data from multiple
10  calls arriving over the same physical line need to be separated by the network access server.
11  UTStarcom argues that the patent refers to logical ports because the process of sorting the data
12  involves both physical and logical ports. (Boyle Decl. Exh. B, Perkins Depo. 51:24-52:18; Boyle
13  Decl. Exh. D, Francis Depo. Tr. 178:14-179:7). Starent argues that this reference is not persuasive
14  because it is not tied to how "port" is used in the rest of the specification or the claims. The
15  question, however, is not whether the patent intended to limit "port" to the logical sense, but rather
16  whether the patent evinces an intent to limit "port" to the physical sense.

17    In sum, Starent does point to an example that is, without debate, a physical port, and the
18  parties disagree over whether other references are limited to physical ports or refer to logical ports.
19  However, Starent points to no language that it argues can be construed as intending to limit the
20  definition of "port" to physical ports.

21                    2.    Dictionary Definitions

22    At the hearing, UTStarcom presented three contemporaneous dictionary definitions for the
23  word "port": 1) "A computer interface capable of attaching to a modem for communicating with a
24  remote terminal; the logical entrance and exit through which data traffic flows into and out of a
25  network." Dictionary of Communications Technology at P. 412 (3rd ed. 1998); 2) "An entrance to,
26  and/or an exit from a network." Newton's Telecom Dictionary at p. 509 (12th ed. 1997); and 3) "A
27  Network entry or exit point." Wireless Technology, A Reference Guide at p. 169 (Premier ed.
28  1998). Starent presented a definition of: "the physical interconnection point or an access point for a

ORDER, *page 7*

For the Northern District of California

United States District Court

1 communication link." IEEE Standard Dictionary of Electrical and Electronics Terms (6th ed. 1997).[4]

2 Thus, the parties have presented contemporaneous definitions which both include and exclude

3 logical connections. Accordingly, the dictionary evidence demonstrates that the understanding of

4 port of one or ordinary skill in the art in 1999 included both logical and physical connections.

5                    3.    Expert Testimony

6 UTStarcom cites expert Dr. Francis, who opined: "In the context of computer networking

7 and in these patent claims, [port] means a defined physical or logical connection where data enters or

8 leaves a network device." (Francis PI Decl. ¶ 43.) Dr. Francis stated: "I understand that claim terms

9 are to be interpreted and understood as they would be interpreted and understood by those of

10 ordinary skill in the field in light of the patent specification and its file history" and that he would

11 "provide the understanding that would be given to the terms by those of ordinary skill in the field."

12 (Id. at ¶ 36.) Dr. Francis does not, however, indicate that he was opining as to the understanding as

13 of 1999. Thus, the credibility of his testimony is lessened by this failure.

14 UTStarcom next asserts that Starent has conceded that the "ordinary meaning" of "port" is

15 not limited to physical ports. (Opening Br. 5:19-20.) Starent's expert, Ennis declared: "Claim 1 also

16 refers to the term 'port', which I think a person of ordinary skill in 1999 would have considered a

17 physical connection point in a device for communication with other devices, because that is (and was

18 in 1999) the most common meaning of the term in the industry." (Ennis PI Decl. ¶ 18.)[5] Although

19 Ennis does not concede that the ordinary meaning included logical connections, he does concede that

20 other meanings of port were known in 1999.

21                    4.    The Court Construction

22 In sum, the contemporary dictionary definitions show logical connections were included in

23 the common meaning of port. The specification contains no contrary definition of the word "port."

24

25 [4]All four of the dictionary definitions were admitted into evidence at the hearing without
objection. UTStarcom also asserted the definition of port in Starent's on-line glossary published in
26 2004. This definition is not relevant because it is not contemporaneous with the patent application (filed
in 1999) and is not intended for common usage. ACTV, Inc. v. Walt Disney Co., 346 F.3d 1082, 1089-
27 90 (Fed. Cir. 2003).

28 [5]"Ennis PI Decl." refers to the declaration submitted by Gregory B. Ennis in opposition to
UTStarcom's motion for preliminary injunction.

1   Although the examples in the specification mostly refer to physical ports, the specification also refers
2   to logical ports. More importantly, the specification discloses no clear use of the term in a limiting
3   manner and no disavowal of the use of the word "port" to refer to logical connections. Accordingly,
4   the court construes port as "a defined physical or logical connection where data enters or leaves a
5   network device."

6   **B.      Dormant/Dormant PPP Session**

7   Starent proposed dormant be defined as: "a state of no active data transfer for a
8   predetermined period of time allowing reallocation of resources, but from which active data transfer
9   can resume more efficiently than it could from an inactive state." (Supp. Jt. Claims Constr. Stmt. at
10   3.) At the hearing, UTStarcom agreed with Starent's definition. (Claim Construction Hearing
11   Transcript at 52:21-22.) (hereinafter "CC Hearing Tr.") The Court finds this a reasonable
12   construction and construes "dormant" as "no active data transfer for a predetermined period of time
13   allowing reallocation of resources, but from which active data transfer can resume more efficiently
14   than it could from an inactive state."

15   UTStarcom proposed "dormant PPP session" be defined as "no active data transfer, but the
16   PPP session is maintained." Starent proposed: "A PPP session assigned a 'dormant' state because
17   no active data transfer has occurred for a predetermined period of time and resources have been
18   reallocated, and during which, the PPP state is not removed." (Supp. Jt. Claims Constr. Stmt. at 5.)
19   The specification defines "dormant PPP session" as "no active data transfer but the PPP session is
20   still active." (Col. 2 lines 29-30.) At the hearing, the parties agreed upon a construction of: "a PPP
21   session in a dormant state." (CC Hearing Tr. at 60-61.) The Court finds this a reasonable
22   construction and construes "dormant PPP Session" as "a PPP session in a dormant state."

23   **C.      Switching/Transferring**

24   The claim language using switching and transferring is: "switching said PPP state from said
25   dormant PPP session associated with said first port to a session associated with said new call set-up
26   message associated with said device at said second port" (Col. 19 lines 1-4) and "wherein said PPP
27   state is transferred to said session associated with said new call set-up message" (Col. 19 lines 5-6).
28   UTStarcom  proposes that switching and/or transferring be construed as "shifting or

United States District Court
For the Northern District of California

1 reassociating PPP state to another session associated with the new call set-up message." Starent
2 proposes "moving PPP state parameters for one session to a new location for use in another session
3 associated with a new call set-up message." (Supp. Jt. Claims Const. Statement at 4.) The dispute is
4 whether switching and transferring include reassociation (as UTStarcom argues) or a physical
5 copying is required (as Starent argues.)

6         1.    Specification

7       Starent argues that the specification implies an intent to limit the term to physical relocation.
8 Starent first points to the specification's reference to "context-switching" between different network
9 access servers. "The 'context-switching' in multiple different network access servers/InterWorking
10 Units is as follows." (Col. 8 lines 9-10) and "A similar process can be used for transferring an active
11 PPP state among different network access servers, as described above." (Col. 9:33-35.) Starent
12 correctly points out that switching and transferring between different network access servers must
13 involve physical copying. Starent also points to the following example:

14     The network access server 24A then 'context-switches' the PPP state from the
    dormant Point-to-Point Frame Relay interface to the active Frame Relay Point-to-
15     Point interface. The PPP module that is controlling the newly-opened connection has
    its PPP 'state' variables populated with copies of those variables in the dormant PPP
16     session.

17 (Col. 7 lines 60-65.) Thus, Starent argues that context switching "must" be physical.

18       However, examples in which context switching is physical does not demonstrate an intent to
19 require physical movement in every instance in which switching is used. In fact, UTStarcom points
20 to two examples in the specification where switching and transferring do not involve physical
21 copying. One embodiment involves the hand-over that occurs when the call comes into the same
22 MCP card. If the new call comes in on the same MCP card, the MCP card handles the hand-over.
23 Because the MARC card holds PPP state and is not involved in this hand-over, there is no physical
24 copying of PPP state. The specification states that, when the MCP card identifies the new call set-up
25 message with an existing dormant session:

26     A path between the frame relay task 116 and the existing system bus session (which
    must already exist if an IMSI is found in the DCD) is then established. PPP
27     offloading state procedures and ACCM (negotiated encoding rules for control
    sequences) are then reapplied to the data path. At this point the data path is opened
28     and the PPP relay module 134 transfers new data packets as usual.

ORDER, *page 10*

United States District Court
For the Northern District of California

1 (Col. 14 lines 43-49.) UTStarcom argues that, because PPP state is not renegotiated for a new call,
2 PPP state must be switched: "The PPP is not moved off of the MARC card. The PPP is not
3 renegotiated. But the mobile user now uses the PPP that was previously associated with the first
4 call. And that is an example of switching." (CC Hearing Tr. at 107:22-108:2.)

5    Starent argues, supported by expert opinion, that this section of the specification does not
6 refer to switching of PPP state and does not practice the method of claim 1 of the '671 patent.
7 Starent asserts that PPP state is not switched because PPP state is stored on the MARC card and the
8 MARC card is, by definition, not involved in the hand-over handled entirely by the MCP card.
9 (Ennis Decl. ¶ 16.) UTStarcom responds that Starent's expert opinion is dependent upon Starent's
10 construction of the terms switching and transferring as requiring physical copying. UTStarcom
11 further argues that, under its proposed construction of "shifting or reassociating PPP state to another
12 session associated with the new call set-up message," the example cited describes switching because
13 the PPP state is reassociated from the first session to the second session.

14    When a call goes dormant, the MCP card drops the connection to the mobile device while
15 maintaining the system bus connection to the MARC card. (Col. 16 lines 27-30.) The MARC card
16 supports the hand-overs by suspending the existing system bus connections to the MCP cards. (Col.
17 16 lines 40-41). A suspended system bus connection maintains the connection between the MARC
18 card and the MCP card as well as the PPP context associated with the connection. (Col. 16 lines 41-
19 44.) If a new call from the same mobile device comes into the same MCP card, the MCP will open a
20 pathway from the new call to the existing system bus connection. (Col. 14 lines 40-49.) In this way,
21 the PPP state from the first session is reassociated to the second session and used to allow for the
22 transmission of data. Thus, the MCP's establishment of a path for the new call (from the second
23 session) to use the existing system bus session (maintaining PPP state from the first session) is an
24 example of switching PPP state under UTStarcom's construction.

25    A construction that would exclude one of the preferred embodiments of the specification is
26 rarely correct. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996) (such a
27 construction is rarely, if ever, correct and would require highly persuasive evidentiary support).
28 At the hearing, Starent argued that Vitronics only referred to the situation where all embodiments

ORDER, *page 11*

1 were excluded. However, the Federal Circuit rejected a construction under which "a preferred (and

2 indeed only) embodiment in the specification would not fall within the scope of the patent claim.

3 Such an interpretation is rarely, if ever, correct and would require highly persuasive evidentiary

4 support." Id. Thus, the exclusion of a single preferred embodiment is disfavored. See also

5 Microsoft v. Multi-Tech Sys, Inc., 357 F.3d 1340, 1353-54 (Fed. Cir. 2004) (declining construction

6 that would exclude one of three preferred embodiments); Invitrogen Corp. v. Biocrest Mfg., L.P.,

7 327 F.3d 1364, 1369 (Fed. Cir. 2003); (declining construction that would exclude some, but not all,

8 embodiments).

9     Additionally, UTStarcom also points to a second example where the specification discloses

10 transfer of PPP state that would fall outside the preferred embodiment under Starent's proposed

11 construction. When the second call comes into a different MCP card, but one associated with the

12 same MARC card as the first call, the MCP card signals the MARC card that there is a new call.

13 The MARC card then determines:

> if a system bus/PPP session already exists for this mobile. If it does the old system
> bus connection is dropped and a new one is established with the MCP. The existing
> PPP context or "state" is transferred to the new SBUS connection and PPP traffic
> flows as if nothing ever happened.

17 (Col. 17 lines 1-6.) In this example, there is no physical movement of PPP state off the MARC card,

18 but the PPP state is "transferred" to the new call.

19          2.     Dictionary Definitions

20    Starent does not argue that the dictionary definition of switching implies physical movement.

21 Instead, Starent argues that transfer implies physical movement and that, because switching and

22 transferring are used interchangeably in the claim, both terms must involve physical movement.

23 Starent relies upon the Merriam-Webster definition of transfer: "to convey from one person, place, or

24 situation to another: TRANSPORT." (Francis PI Decl. Exh E, Merriam-Webster's Collegiate

25 Dictionary (Tenth ed. 2001). UTStarcom relies upon a different definition from the same dictionary

26 "to cause to pass from one to another: TRANSMIT." (Id.) In this case, transfer is being applied in a

27 virtual context. Thus, the general definition, especially when used as "transport," is not helpful

28 because it has no relation to the context in which the patent uses the word. Ferguson Beauregard v.

United States District Court
For the Northern District of California

Mega Sys., LLC, 350 F.3d 1327, 1338 (Fed. Cir. 2003) ("Dictionary definitions, while reflective of the ordinary meanings of words, do not always associate those meanings with context or reflect the customary usage of words by those skilled in a particular art.")

### 3. Expert Opinion

UTStarcom argues that one of ordinary skill in software and computer networking would understand "switching" to include logical movement within a data structure and would not require physical copying of data. (Francis PI Decl. ¶ 52.) For example, when one moves a file from one directory to another, the file contents are normally not copied, instead, the new directory is associated with the file. (Francis PI Decl. ¶ 53.) UTStarcom also argues that in the virtual context things are moved or transferred without physical relocation. For example, money is transferred between bank accounts without the movement of bags of money. Starent argues that Dr. Francis' definition is limited solely to the software context and is thus inapplicable to this patent where both software and hardware are involved. Dr. Francis, however, specifically ties his definition to the invention and to transfer of PPP state within a network access server.

Starent expert Perkins opines "context-switching " refers to physical movement of data. However, Perkins did not agree that this understanding would have been shared in 1999 by one of ordinary skill in the art. Instead, Perkins opined that context switching was not widely discussed at the time. (Mosko Decl. Sealed Exh F, Perkins Depo Tr. at 59:7-22.) Accordingly, this testimony is not persuasive of how the term would have been understood by one of ordinary skill in the art in 1999. Moreover, UTStarcom expert Francis disagreed, stating that context switching could include two methods; one where the data is not moved and "some other data structure is modified to indicate that the data that was there is now to be associated with something new" and one that would include copying. (Cannon Decl. Sealed Exh. D, Francis Depo. at 173-74.)[6] Dr. Francis, however, also did

//

//

---

[6]Starent argues that Dr. Francis conceded that the description of context switching limits it to physical copying. The deposition testimony, however, is clear that Dr. Francis finds the language referring to a single description of a process that could involving either copying or reassociation.

United States District Court

For the Northern District of California

1    not opine as to how one of ordinary skill in the art in 1999 would have understood the phrase.[7]

2           4.      The Court Construction

3       In sum, the specification discloses two examples of the preferred embodiment which would

4 be excluded from the claims of the patent under Starent's proposed construction, but which would be

5 included under UTStarcom's construction. Starent has not pointed to any language in the

6 specification that purports to limit the definition of switching or transferring to only physical

7 copying. Starent has also not produced evidence that one skilled in the art in 1999 would have

8 understood switching and transferring to be limited to physical copying. Thus, Starent has not

9 produced any highly persuasive evidence that would justify its exclusionary construction.

10 Accordingly, the Court construes "switching" and "transferring" as "shifting or reassociating PPP

11 state to another session associated with the new call set-up message."

12      **D.     Session**

13       On May 24, 2005, the parties added the term "session" as a term in need of construction.

14 UTStarcom proposed that "'a session' is not limited to a PPP session and 'said session' is not limited

15 to a PPP session." Starent proposed "'a session' means 'a PPP session' and 'said session' means

16 'said PPP session.'" (Add. to Supp. Jt. Claims Constr. Chart.) At the hearing, UTStarcom proposed

17 that a "session" mean "a communication path from one device to another and not a PPP session."

18 (CC Hearing Tr. at 31:14-15.) UTStarcom supports this construction with the following definition

19 of "Session" as: "a related set of communications transactions between two or more network

20 devices." (Boyle Decl. Exh. F., McGraw-Hill Illustrated Telecom Diction (2nd ed. 2000) at p. 527.)

21 UTStarcom also cites deposition testimony of Starent expert Ennis:

22        Very generally, the term 'session,' you know, can refer to a – some kind of a
       established communication path from one device to another that is established, used
23        for some period of time, and then is terminated.

24 (Boyle Decl Exh E., Ennis Depo. Tr. at 48.) Thus, UTStarcom argues that session should be

25 construed as used in this patent to require no more than a communication path. Communication,

26 however, requires the establishment of parameters for the exchange of data. (See Transcript of

27            [7]As noted above, Dr. Francis' declaration does refer to the understanding of one skilled in the
28 art in light of the specification, but is not specific to 1999.

ORDER, *page 14*

1  Tutorial held May 11, 2005 (hereinafter "Tutorial Tr.")  at 31:4 - 32:18) (describing how a PPP

2  session requires a negotiation of parameters to allow for data transfer); Ennis Depo. Tr. at 48:20-25

3  (indicating that specific protocols are used in providing the communication.)[8]  Thus, the proposed

4  construction of session is troubling because it does not provide for any protocols or methods that

5  would allow for data exchange.

6  However, the parties do not dispute that the general definition of "session" is not limited to a

7  PPP session. The dispute here is the proper definition of "session" in the context of the patent.

8  Accordingly, whether the proposed definition would be sufficient in a vacuum is of no import and

9  the Court turns to proper definition in the context of the '671 patent.

10                  1.      The Claim Language

11                          a.      Claim language does not uniformly use PPP in each reference to the
                                    PPP session

12      UTStarcom argues that the claim language expressly refers to any session that had to be a

13  PPP session as a PPP session. Thus, any reference to a session without the modifier "PPP" refers to

14  a session that is not a PPP session.  However, the claim language is not that precise.  Instead, the

15  claim language states:

16      initiating a Point-to-Point Protocol **(PPP) session** [1st] between said device and a

17      network access server, said network access server providing access to said packet
        switched network for said device, said **session** [2nd] associated with a PPP state and

18      with a first port in said network access server, wherein said **PPP session** [3rd]
        thereafter becomes dormant but said PPP state is not removed from said network

19      access server;

20      receiving, after said **PPP session** [4th] has become dormant, at said network access
        server a new call set-up message associated with said device, said new call set-up

21      message arriving at a second port in said network access server;

22      switching said PPP state from said dormant **PPP session** [5th] associated with said
        first port to **a session** [6th] associated with said new call set-up message associated

23      with said device at said second port,

24      wherein said PPP state is transferred to said **session** [7th] associated with said new call
        set-up message and the negotiation of link control protocols or network control

25      protocols between said device and said network access server may be avoided.

26

27      _____

28      [8]Unfortunately, page 49 of the Ennis Deposition transcript is not in the record, so the import of
        the Ennis testimony is not clear.

United States District Court
For the Northern District of California

1   (Col 18 line 55 - Col. 19 line 9.) (emphasis and bracketed numerical references added).[9] In the

2   second reference (referring to the first session), the claim merely states "said session associated with

3   a PPP state." Moreover, this is similar to both the sixth and the seventh references (referring to the

4   second session). The sixth reference involves "switching said PPP state" to a session associated with

5   said new call set-up message and the seventh reference states "PPP state is transferred to said

6   session ." Accordingly, the claim language does not expressly use "PPP session" for any session that

7   is a PPP. Thus, the language is, at best, ambiguous.

8
          b.    Patent Parlance does not clarify that the second session is not a PPP
9                session

10   UTStarcom next argues that, as a matter of patent parlance, the claim language discloses that

11  the second session is not a PPP session. UTStarcom cites Landis on Mechanics of Patent Claim

12  Drafting (4th Ed. 1996) at § 23 for the proposition that the first time an element is mentioned it

13  should be preceded by an indefinite article "a" or "an" and should not be preceded by a definite

14  article such as "the or "said." Thus, when an indefinite article is used, it suggests that a new

15  element is being identified. UTStarcom then argues that the first time the second session is referred

16  to in the claims language [the sixth reference], it is preceded by the indefinite article "a", suggesting

17  a new element. Starent agrees that the second session is a new element; it is different from the first

18  session and thus, could not have been referred to as "said session" or "the session." However, the

19  use of the indefinite article sheds no light on the specific nature of the new, second session.

20   UTStarcom also argues that construing the second session as a PPP session would lead to

21  ambiguity in the claim 2. Claim 2 states:

22      The method of claim 1, wherein said PPP session becomes dormant due to movement
         of said device relative to a first radio tower linking said device to a wireless
23      communications network, and wherein said new call set-up message is initiated in
         response to said device coming within range of a second radio tower in said wireless
24      communications network.

25  (Col. 19 lines 10-16.) UTStarcom argues that "said PPP session" would be ambiguous if there are

26  two PPP sessions in claim 1. However, the reference to "wherein said PPP session becomes

27
      [9]The parties agree that references 1-5 are to the first session and references 6 and 7 are to the
28  second session.

United States District Court
For the Northern District of California

1 dormant" is clear because only the first PPP session becomes dormant.

c. Construction requiring a second PPP session is consistent with the invention

4 UTStarcom next argues that construing session to mean PPP session would not be consistent

5 with the invention. UTStarcom argues that a PPP session must have a negotiated PPP state.

6 UTStarcom draws two conclusions from this fact: 1) a second PPP session would require two

7 negotiations, which would be contrary to the invention; and 2) a second PPP session would render

8 the switching element meaningless because it would make no sense to transfer PPP state to a second

9 PPP session. (Opening Brief at 10-11.) UTStarcom's arguments, however, fail to recognize that the

10 patent describes the switching of PPP to a second PPP session in order to avoid a second negotiation.

11 The patent specification states:

An object of the invention is to provide a method to allow a PPP session to go
13 dormant and then dial back into a different port on the same network access server
without needing to go through the standard LCP and NCP negotiations to bring the
14 new PPP session active.

15 (Col. 2 lines 53-57.) As the Court noted in the Order denying Preliminary Injunction:

16 Thus, the patent describes the invention as using two PPP sessions without re-
negotiation. While it is true that negotiation is necessary for a PPP session to exist,
17 the point of the invention is to save and transfer the PPP state to allow the second PPP
session to become active without the second negotiation. Thus, the second PPP
18 session starts after the transfer of the state instead of after the negotiation.

19 (June 17, 2005 Order Denying Preliminary Injunction at 7:19-23). This finding is consistent with

20 UTStarcom's position expressed in its Reply Brief on Claim Construction issues (filed on June 16,

21 2005): "The second session, however, cannot be a PPP session until either PPP state is switched or

22 PPP is renegotiated." (Reply at 6:17-18.)

23 UTStarcom also argues that the agreed definition of "PPP Session" of "the time during

24 which a communications device and a network access server are maintaining a negotiated PPP state,"

25 is inconsistent with two PPP sessions because the negotiated PPP state is maintained throughout the

26 hand-over. Because PPP state is maintained, UTStarcom argues that only one PPP session can be

27 present.

28 Starent responds that nothing in the definition of PPP Session requires that the reuse of

ORDER, *page 17*

United States District Court
For the Northern District of California

negotiated PPP state inevitably results in the continuation of a single session. Starent's logic is correct. Just as a new PPP session can start when PPP state is transferred, the prior PPP session can end at the transfer of PPP state.

The specification specifically describes multiple PPP sessions sharing a single negotiated PPP state. In the section describing hand-overs between calls, the process by which PPP state is transferred from an old call to a new call, the specification describes the hand-over between MARC cards in a single IWU as follows: "The MARC card 60 (FIG. 2) handles hand-overs when the mobile node moves about the wireless network such that **new PPP sessions** are set up between different MCP cards within the same IWU." (Col 14 lines 29-32.) (emphasis added). Additionally, the specification describes a hand-over as involving the end of one PPP session and the start of a new PPP session. The specification describes the hand-over when the new call set-up message is received by a different IWU as follows:

> If the RADIUS server determines that the mobile device already has authenticated at another MARC, the RADIUS server will send a resource-reclaim to the old MARC and then send an access-accept to the new MARC. This tears down the PPP connection on the old MARC card and establishes **a new PPP session** from the new MARC card to the mobile.

(Col. 17 lines 12-18.) (Emphasis added.) Thus, the specification does not support UTStarcom's argument that maintenance of PPP state precludes the possibility of multiple PPP sessions.

Moreover, multiple PPP sessions using a single PPP state is consistent with the technology available when the patent application was filed. Under the older legacy system, the frame-relay circuit that connected the Base Station Controller to the network access server was completely dedicated to the single call. (Tutorial Tr. at 37-38.) Under this system, two PPP sessions were required when a user moved from tower to tower because the available technology did not allow for a single subscriber session to have simultaneously two points of attachment in a wireless network. (Ennis PI Decl. ¶ 27.)

Finally, UTStarcom's own expert, Dr. Francis, accepted transfer of PPP state between two PPP sessions when he asserted that the accused device: "will transfer the PPP state from the PPP session associated with its PCF1 port to the PPP session associated with its PCF2 port." (Francis PI

//

1    Decl. ¶ 70.)[10]

2    Thus, although maintenance of PPP state is necessary for continuation of a PPP session, it

3    does not necessarily result in continuation of the same PPP session.[11] Accordingly, a construction

4    that results in two PPP sessions and one negotiated PPP state is consistent with the invention.

5                        2.    The Specification

6    UTStarcom and Starent both argue that portions of the specification support their proposed

7    constructions. Additionally, UTStarcom argues that the references in the specification to two PPP

8    sessions are consistent with its proposed construction that the second session is not a PPP session.

9
                                   a.    References to two PPP sessions and references to the second session
10                                        without use of the PPP modifier

11   In explaining the Background of the Invention, the specification states:

12       The known prior art has failed to recognize that if a PPP session for a user goes
         dormant and the user then connects to a different IWU (or to a different port in the
13       same IWU) that the PPP negotiated parameters and the state for a call which is
         currently going dormant can be used to make the **new PPP connection**, without
14       repeating the lengthy PPP negotiations.

15   (Col. 2 lines 14-20.) (emphasis added.) Similarly, the specification also states:

16
         When a **new PPP circuit** is established from the mobile device, via the new base
17       station, to the network access server, the network access server/IWU would go
         through the PPP protocol negotiation procedure in accordance with the prior art
18       approach. In **our invention**, however, the PPP state from the dormant PPP session
         (i.e., no active data transfer but the PPP session is still active) is switched over to the
19       **new, active PPP session**, without requiring re-negotiation of the PPP parameters.
         *Moreover, the switching of PPP state can occur without the mobile communications*
20       *device having to disconnect and reconnect its PPP session.*

21   (Col. 2 lines 23-34.) (emphasis added.) This reference to "our invention" as involving a new PPP

22   session is particularly telling as a limitation of the invention. See Alloc, Inc. v. International Trade

23   Commission, 342 F.3d 1361, 1368-69 (Fed. Cir. 2003) (Specification description of "the invention"

24
25       [10]The Court expresses no opinion as to whether the accused devices performs as asserted, but
     merely notes Dr. Francis' opinion that transfer of PPP state between PPP sessions is possible.
26
         [11]At the hearing, UTStarcom argued that the agreed upon definition of PPP Session would need
27   to be modified to add "over a given pathway" in order to be consistent with two PPP sessions and one
     maintained PPP state. Because the maintenance of PPP state is consistent with multiple PPP sessions,
28   it is not necessary to modify the jointly agreed upon definition of PPP session.

1  referred to the invention as a whole, not merely a preferred embodiment.) Nonetheless, UTStarcom

2  argues that the last two lines of the quoted section shows that the patent involves only one PPP

3  session. The reference in the line immediately prior the new, active PPP session, however, belies

4  this argument.

5      Similarly, UTStarcom also quotes:

6      The invention is especially useful in wireless networks . . . . the PPP state from **the**
       **dormant session** can be used in the **new session** without the user having to
7      renegotiate the PPP protocols.

8  (Col. 2 lines 40, 49-51) (emphasis added). The specification's very next words (albeit in a new

9  paragraph) again show two PPP sessions:

10
       An object of the invention is to provide a method to allow a PPP session to go
11     dormant and then dial back into a different port on the same network access server
       without needing to go through the standard LCP and NCP negotiations to bring the
12     **new PPP session** active.

13  (Col. 2 lines 52-57) (emphasis added.)

14      The Summary of Invention section also contains insight into the second session:

15     Rather than re-negotiate the PPP protocols (LCP and NCP) for the new session, the
       PPP state is switched from the dormant PPP session associated with the first port to
16     the session associated with the second port in the network access server. Thus, the
       PPP state is transferred to **the PPP session** associated with the new call set-up
17     message and the negotiation of link control protocols or network control protocols
       between the device and the network access server may be avoided.

18
   (Col. 3 lines 33-41) (emphasis added.) Thus, the summary of the invention specifically limits the
19
   second session to a PPP session. C.R. Bard, Inc. v. United States Surgical Corp., 388 F.3d 858, 864
20
   (Fed. Cir. 2004) ("Statements that describe the invention as a whole are more likely to be found in
21
   certain sections of the specification, such as the Summary of the Invention.")
22
       The specification also provides:
23
       When the device comes into range of radio tower 18B, **a new PPP link** is established
24     between the device 14, tower 18B and a second port in the network access server 24A
       in accordance with a preferred embodiment of this invention. . . .*Rather than*
25     *renegotiate the PPP, LCP and NCP protocols, the present invention takes advantage*
       *of the fact that the PPP state for the dormant session can be switched to the new*
26     *session associated with new call set-up message received at the second port.*

27  (Col. 7 lines 14-26) (emphasis added.) UTStarcom quotes the portion in italics and argues that the

28  "new session" is not specifically designated as a PPP session. However, the use of the phrase "a new

ORDER, *page 20*

1    PPP link" in the same paragraph shows that, in context, two PPP sessions are contemplated.

2    Finally, UTStarcom quotes the abstract on the cover of the patent as evidence that only one

3    PPP session is contemplated.

> The network access server does not get rid of the PPP state for the dormant session,
> but rather switches that PPP state to a **new session**, such as when the client moves
> into range of a different radio tower and associated base station and initiates **a new**
> **active session** on the interface to the wireless network.

7    (abstract, p. 1 )

8    UTStarcom argues that, because PPP is not used to modify the "new session" or the "new

9    active session," the new session is not a PPP session. However, the abstract describes switching PPP

10   state to the "new  session" and a person of ordinary skill would understand that a PPP session is the

11   only type of session to have any use for a PPP state. (Ennis Decl. ¶ 7.) Additionally, the

12   specification describes transfer of PPP state to a new PPP session multiple times. (Col. 2 lines 19,

13   30, 57; Col. 3 lines 37-38; Col. 7 line 15). Thus, the reference to a new session, when considered in

14   context, refers to a new PPP session.

15   Moreover, the abstract refers to the "dormant session" not the "dormant PPP session." Thus,

16   the modifier PPP is not always used for either the first or second session. Indeed, the specification

17   refers to the first session multiple times without using the modifier PPP. (See Col. 2 lines 47-49

18   ("the session goes dormant . . . PPP state from the dormant session"), Col. 7 lines 31-32 ("the first

19   session becomes dormant")). Thus the failure to use PPP as a modifier in every instance in which

20   the specification refers to the second session does not indicate the second session is not a PPP

21   session. Looking at the specification as a whole, the intent that the second session be a PPP session

22   is clear and the failure to recite PPP before session every time does not mean that the specification

23   discloses a second non-PPP session. C.R. Bard, Inc. v. United States Surgical Corp., 388 F.3d 858,

24   865-66 (Fed. Cir. 2004.)

25

26              b.    UTStarcom's proposed reconciliation of patent specification references
                     to two PPP sessions with the second session not being a PPP session

27   UTStarcom argues that the specification's references to a second PPP session are "fully

28   consistent with UTStarcom's interpretation - because the user ultimately will be using PPP to

ORDER, *page 21*

1  continue accessing the Internet after the user moves." (Reply at 6:16-17.) According to

2  UTStarcom, "The second 'session' of the claims is the session initiated after movement, but before

3  any PPP state transfer." (Reply at n. 5) UTStarcom then argues that, because the second session

4  cannot be a PPP session until PPP state is either negotiated or switched, the second session is

5  something other than a PPP session. UTStarcom notes that: "When the PPP is switched, the mobile

6  user enjoys 'continuous, uninterrupted access' using the same PPP state." (Reply at 6:20-21.)

7  Finally, UTStarcom argues that the access to the internet is via the original PPP session, because PPP

8  is not renegotiated.

9       This attempted reconciliation fails to explain: 1) what happens to the second session after

10  PPP state is transferred to it; 2) why the second PPP session referenced in the specification is not the

11  second session referenced in the claims; and 3) how access to the internet is accomplished through

12  the first PPP session. UTStarcom's only support appears to be the argument that the maintenance of

13  PPP state mandates the continuation of the original PPP session. As discussed above, maintenance

14  of PPP state does not mandate the continuation of a single PPP session. Additionally, the

15  specification does not support the argument that the second session is not a PPP session and internet

16  access continues via the first PPP session. If UTStarcom were correct, the specification would state

17  that PPP state is transferred to the new "session", allowing the user to access the internet via the first

18  PPP session. Instead, it states:

19          In our invention, however, the PPP state from the dormant PPP session (i.e., no
           active data transfer but the PPP session is still active) is switched over to the **new,**
20          **active PPP session**, without requiring re-negotiation of the PPP parameters.

21  (Col. 2 lines 27-31) (emphasis added.) Moreover, the specification describes a second PPP session

22  in multiple places (Col. 2 lines 14-31, 52-57; Col. 3 lines 33-41; Col. 7 lines 14-17), but never

23  describes UTStarcom's second claim session – a session of undetermined type (but not a PPP

24  session), existing only prior to transfer of PPP state, and disappearing without further mention.

25          3.    The Prosecution History

26       On October 25, 2002, during prosecution of the application that became the '671 patent,

27  UTStarcom submitted a response to the United States Patent and Trademark Office in an effort to

28  overcome prior art rejections. The examiner had rejected claims 1-10 as obvious in light of U.S.

United States District Court
For the Northern District of California

1    Patent Nos. 6,421,714 ("Rai") and 6,400,712 ("Phillips," Perkins PI Decl. Exh. D.) In arguing that

2    the rejection of claim one was improper, UTStarcom described claim 1 as follows:

3         In the method of claim 1, a PPP session is established between the device and a first
          port of a network access server (NAS), which then becomes dormant. Subsequently,
4         a new set-up message associated with the device is received on a second port of the
          NAS. The dormant PPP session is then transferred to a **PPP session** associated with
5         the second port, avoiding the negotiation of link control protocols.

6    (Response, Perkins PI Decl. Ex. C. at 2-3). Thus, in order to obtain the patent, UTStarcom

7    specifically described claim 1 as having a second session that is a PPP session. Microsoft v. Multi-

8    Tech Sys, Inc, 357 F.3d 1340, 1349 (Fed. Cir. 2004.) (Binding patentee to summary of invention

9    provided as preface to response to rejection for obviousness.)

10        UTStarcom claims that the prosecution history supports its construction and cites to the same

11   document as Starent. UTStarcom points to two sections of the response wherein the second session

12   is described without the modifier PPP. (Response at 6,7.) The first reference asserts that the Rai

13   patent does not disclose switching that dormant PPP session to **a session** associated with a new call

14   set-up message associated with a communications device at a second port of the network access

15   server." (Id. at 6.) (emphasis added.) The second reference states that the combination of the

16   Phillips and Rai patents does not include "switching PPP state from a dormant PPP session

17   associated with a communications device and a first port in a NAS to **a session** associated with a

18   new call set-up message associated with the communications device at a second port in the NAS."

19   (Id. at 7) (emphasis added.) There is nothing, however, in these passages that indicates that the

20   second session is not a PPP session. In light of the earlier statement that the invention included

21   transfer to a "PPP session associated with the second port," the prosecution history supports

22   Starent's construction that the second session is a PPP session.

23                       4.    The Court Construction

24        In short, UTStarcom's argument that a session is not a PPP session asks the court to

25   impermissibly interpret the term in a vacuum. Slimfold Mfg. Co v. Kinkead Indus, Inc. 810 F.2d

26   1113, 1116 (Fed. Cir. 1987). At the hearing, the Court asked UTStarcom what the session is, if not a

27   PPP session. UTStarcom responded:

28        It's a session which is – it could be different things in different technologies. It could

ORDER, *page 23*

1  be a preexisting -- we've  talked about the R-P sessions, but generally the reason
2  we've defined "session" broadly is it's a communications pathway.

3  (CC Hearing Tr. at 47:15-22.).  Thus, UTStarcom asks this court to do exactly what the Federal

4  Circuit recently cautioned against, to start with the broadest definition possible, without reference to

5  the context of the patent.  Phillips v. AWH Corp., ---- F.3d ----, 2005 WL 1620331 at *13-15

6  (Fed. Cir. July 12, 2005) (en banc).  Accordingly, the Court construes "session" to be "a PPP

7  session."

8  **IV.    CONCLUSION**

9  For the foregoing reasons, It Is hereby Ordered that:

10     1.    The court construes "port" as "a defined physical or logical connection where

11           data enters or leaves a network device"

12     2.    The Court construes "dormant" as "no active data transfer for a predetermined

13           period of time allowing reallocation of resources, but from which active data

14           transfer can resume more efficiently than it could from an inactive state"

15     3.    The Court construes "dormant PPP Session" as "a PPP session in a dormant

16           state"

17     4.    The Court construes "switching" and "transferring" as "shifting or

18           reassociating PPP state to another session associated with the new call set-up

19           message"  and

20     5.    The Court construes "session" to be "a PPP session."

21

22  IT IS SO ORDERED.

23  Dated: 8/11/05

24

25  PATRICIA V. TRUMBULL
    United States Magistrate Judge

26

27

28

ORDER, *page 24*