1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          NORTHERN DISTRICT OF CALIFORNIA
10         SAN JOSE DIVISION
11

| 12 | UTSTARCOM, INC., | ) | Case No.: C04-1122 PVT |
| 13 | Plaintiff, | ) | **ORDER GRANTING DEFENDANT** |
| | | ) | **STARENT NETWORKS CORP'S** |
| 14 | v. | ) | **MOTION FOR SUMMARY** |
| | | ) | **JUDGMENT** |
| 15 | STARENT NETWORKS CORP., | ) | |
| 16 | Defendant. | ) | |
| 17 | | ) | |

18

19      On November 8, 2005, Plaintiff UTStarcom, Inc.'s ("UTStarcom") and Defendant Starent

20  Networks Corp. ("Starent") appeared for hearing on Starent's motion for summary judgment of

21  noninfringement.[1]  Based on the briefs, evidence and arguments submitted,

22      IT IS HEREBY ORDERED that Starent's motion for summary judgment is GRANTED

23  for the reasons set forth herein.

24

25  **I.     INTRODUCTION**

26      This is an action for patent infringement.  UTStarcom owns U.S. Patent No. 6,628,671

27

28      [1]     The holding of this court is limited to the particular facts and circumstances at
issue in this action.

("the '671 Patent") which covers, among other things, a method of connecting a wireless mobile device to a packet switched network that allows the mobile device to change locations without interrupting internet service.  Starent makes a device called the "ST16."  The parties agree that the ST16 complies with the 3rd Generation Partnership Project 2 wireless IP network standard (the "3GPP2 Standard").  UTStarcom alleges that one of the 3GPP2  Standard processes–and Starent's ST16–infringe claims 1 and 2 of the '671 Patent.

Starent has now moved for summary judgment, contending that UTStarcom does not have sufficient evidence to prove infringement.  After considering the evidence proffered by UTStarcom in response, the court agrees that summary judgment is warranted.  As discussed in more detail below, UTStarcom has presented evidence that at most would support a finding that Starent's accused device can be used in a way that achieves the same results as claims 1 and 2 of the '671 Patent.  However, achieving the same results as a patented method or device, without more, does not constitute infringement.  *See, e.g., Universal Gym Equipment, Inc. v. ERWA Exercise Equipment Ltd.*, 827 F.2d 1542, 1548 (Fed.Cir. 1987).

## II.    LEGAL STANDARDS

### A.    SUMMARY JUDGMENT

The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett,* 477 U.S. 317, 323-24 (1986).  To obtain summary judgment, a party must demonstrate that no genuine issue of material fact exists for trial, and that based on the undisputed facts he is entitled to judgment as a matter of law.  *Id.,* at 322.

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323.  If the moving party meets its initial burden, then the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.PRO., Rule 56(e).

The moving party in not required to negate the elements of the non-moving party's case

on which the non-moving party bears the burden of proof. *Celotex,* 477 U.S. at 323. On the contrary, "regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Ibid.* Thus, the moving party need only assert that the non-moving party will not be able to meet its burden at trial in order to put the non-moving party to its proof. The non-moving party cannot defeat such a motion for summary judgment simply by *alleging* a factual dispute between the parties. To preclude summary judgment, the non-moving party must bring forth material facts, i.e., "facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

If the non-moving party shows that it cannot, for reasons stated, present by affidavit facts essential to justify its opposition, the court may either deny or continue the motion to allow additional discovery. FED.R.CIV.PRO., Rule 56(f). However, "[t]he burden is on the party seeking additional discovery to proffer sufficient facts to show that the evidence sought exists, and that it would prevent summary judgment." *See Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1161 n. 6 (9th Cir. 2001).

In ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of the non-moving party. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520 (1991); *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 588 (1986). However, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 588.

It is the court's responsibility "to determine whether the 'specific facts' set forth by the non-moving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service v. Pacific Elec. Contractors,* 809 F.2d 626, 630-31 (9th Cir. 1987). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. However, "[w]here the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587.

**B.    PATENT INFRINGEMENT**

**1.    Direct Infringement**

A patent infringement analysis involves two steps: 1) claim construction; and 2) application of the properly construed claims to the accused device or method. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed.Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996). The first step is a matter of law. *Id.* at 979. The second step is a factual question. *Bai v. L & L Wings, Inc.,* 160 F.3d 1350, 1353 (Fed.Cir. 1998). To prove infringement, a patent holder must show that the accused device or method meets each claim limitation, either literally or under the doctrine of equivalents. *Deering Precision Instruments, L.L.C. v. Vector Distribution Systems, Inc.,* 347 F.3d 1314, 1324 (Fed.Cir. 2003).

In a patent case, summary judgment is appropriate "when the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial." *TechSearch, L.L.C. v. Intel Corp.,* 286 F.3d 1360, 1369 (Fed.Cir. 2002). An accused infringer is entitled to summary judgment if the patent holder fails to put forth *evidence* that *each* limitation of the asserted claim is met in the accused device or method, either literally or by a substantial equivalent; general assertions of facts and conclusory statements are insufficient to shoulder the non-movant's burden. *See Johnston v. IVAC Corp.,* 885 F.2d 1574, 1577-78 (Fed.Cir. 1989); *see also Phillips Petroleum Co. v. Huntsman Polymers Corp.,* 157 F.3d 866, 876 (Fed.Cir. 1998) (patentee failed, through the conclusory statements of experts, to raise a genuine issue of material fact precluding summary judgment).

The manufacture and sale of a *device* without more cannot directly infringe a *method* patent for a method that employs such devices; such a method patent is directly infringed only when the device is actually used in the claimed method. *See Mendenhall v. Cedarapids, Inc.,* 5 F.3d 1557, 1579 (Fed.Cir.1993) (manufacture and sale of a drum mixer did not directly infringe method patent that covered method for preparation of hot mix asphalt).

**2.    Indirect Infringement**

To prevail under a theory of indirect infringement, a patent holder must first prove that

the defendant's actions led to direct infringement of the patent-in-suit. *Dynacore Holdings Corporation v. U.S. Philips Corporation*, 363 F.3d 1263, 1274 (Fed.Cir. 2004). A defendant's liability for indirect infringement must relate to the identified instances of direct infringement. *See Ibid.*

In order to prove that a defendant's device contributorily infringes a patent under 35 U.S.C. § 271(c), in addition to proving an act of direct infringement, a plaintiff must show that the defendant's components have "no substantial non-infringing uses," and that the defendant "knew that the combination for which its components were especially made was both patented and infringing." *See Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1061 (Fed.Cir. 2004) (internal quotations omitted).

In order to prove a defendant induced infringement under 35 U.S.C. § 271(b), a plaintiff must show that the defendant took actions that actually induced direct infringement by another, and that the defendant knew or should have known that such actions would induce direct infringement. *Ibid.*

A patent holder may either identify individual acts of direct infringement, or an entire category of infringers (e.g., a defendant's customers). *Dynacore*, 363 F.3d at 1274. In *Dynacore*, the patent holder sued manufacturers of products whose software conformed to an allegedly infringing industry standard. The Federal Circuit noted that Dynacore had to "either demonstrate that all LANs compliant with the IEEE 1394 Standard *necessarily* infringe the '732 Patent, or point to a specific instance of direct infringement and restrict its suit to liability stemming from that specific instance." *Id.* at 1275-76 (emphasis added). The Federal Circuit further noted that "[w]e do not reach the defendant's liability under 35 U.S.C. § 271(b) or (c) if there are substantial non-infringing uses of the defendants' products and there is no evidence of active and willful inducement." *Id.* at 1276.

### 3.    Doctrine of Equivalents

Infringement under the doctrine of equivalents does not require complete identity for every purpose and in every respect, but does require substantial identity of function, means, and result. *Graver Tank and Mfg. Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 608-9 (1950).

The patent holder must prove substantial identity with regard to all three elements of the doctrine specified in *Graver Tank*: the function performed, the means by which the function is performed, and the result achieved. *Universal Gym Equipment, Inc. v. ERWA Exercise Equipment Ltd.*, 827 F.2d 1542, 1548 (Fed.Cir. 1987).

The "all elements rule" provides that "the doctrine of equivalents does not apply if applying the doctrine would vitiate an entire claim limitation." *Asyst Techs., Inc. v. Emtrak, Inc.*, 402 F.3d 1188, 1195 (Fed.Cir. 2005).   Under this rule, the doctrine of equivalents cannot be used to equate a claim limitation with its opposite. *Ibid.* ("To hold that 'unmounted' is equivalent to 'mounted' would effectively read the 'mounted on' limitation out of the patent."); *see also Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed.Cir. 2000) ("it would defy logic to conclude that a minority–the very antithesis of a majority–could be insubstantially different from a claim limitation requiring a majority, and no reasonable juror could find otherwise.")

The doctrine of equivalents also cannot allow a patent to encompass subject matter existing in the prior art. *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1367 (Fed.Cir. 1999), citing *Wilson Sporting Goods Co. v. David Geoffrey & Assoc.*, 904 F.2d 677, 684(Fed.Cir. 1990) ("[A] patentee should not be able to obtain, under the doctrine of equivalents, coverage which he could not lawfully have obtained from the PTO by literal claims.").

### III.   FACTUAL BACKGROUND

#### A.   RELEVANT WIRELESS TECHNOLOGY

This action involves equipment that allows the users of wireless mobile devices ("Mobile Devices"), such as cell phones, to access the Internet.[2]   Mobile Devices generally contain radio transmitters and radio receivers that communicate with a local radio tower and corresponding radio equipment.   Mobile Devices also contain microprocessors that run software, including communications protocols that allow the Mobile Device to interact with other pieces of

---

[2]   This brief statement of background facts is derived from UTStarcom Inc.'s Opposition to Starent Network Corp.'s Motion for Summary Judgment ("UTStarcom's Opposition"), filed herein.

1    telecommunications equipment.

2    In order to allow their customers to access the Internet, wireless communications

3    providers use a certain kind of router that connects the radio network to the Internet.  In 3GPP2

4    Standard networks, such a router is referred to as a Packet Data Serving Node ("PDSN").  A

5    PDSN can also generally be referred to as a "network access server" because it allows the

6    telecom network users to access the Internet.

7    One widely used protocol for accessing the Internet is the Point-to-Point Protocol

8    ("PPP").  PPP runs on software present in both the Mobile Device and the PDSN.  PPP begins

9    with a back-and-forth exchange of information, called a "negotiation."  The PPP negotiation

10   establishes the parameters for the transmission and reception of data packets between the Mobile

11   Device and the network access server.  The negotiated parameters are referred to as "PPP State."

12   Once PPP State has been negotiated, the Mobile Device can access the Internet through the

13   PDSN.

14   **B.    THE '671 PATENT CLAIMS**

15   Claim 1 and dependent Claim 2 of the '671 Patent read as follows:

16       1.    A method of connecting a communications device to a packet switched
     network, comprising the steps of:
17       initiating a Point-to-Point Protocol (PPP) session between said device and a
             network access server, said network access server providing access to said packet
18           switched network for said device, said session associated with a PPP state and
             with a first port in said network access server, wherein said PPP session thereafter
19           becomes dormant but said PPP state is not removed from said network access
             server;
20       receiving, after said PPP session has become dormant, at said network access
             server a new call set-up message associated with said device, said
21           new call set-up message arriving at a second port in said network
             access server;
22       switching said PPP state from said dormant PPP session associated with said
             first port to a session associated with said new call set-up message
23           associated with said device at said second port,
         wherein said PPP state is transferred to said session associated with said new
24           call set-up message and the negotiation of link control protocols or
             network control protocols between said device and said network
25           access server may be avoided.
         2.    The method of claim 1, wherein said PPP session becomes dormant due to
26       movement of said device relative to a first radio tower linking said device to a
     wireless communications network, and wherein said new call set-up message is
27       initiated in response to said device coming within range of a second radio tower in
     said wireless communications network.

28   ('671 Patent, 18:52 – 19:16.)

During claims construction, the court construed the terms "port," "switching/transferring," and "session." The parties agreed on the construction of "PPP state," "PPP session" and "dormant/dormant PPP session," and the court adopted the agreed-upon construction of those terms.

The court construed "port" as "a defined physical or logical connection where data enters or leaves a network device."

The court construed "switching" and "transferring" as "shifting or reassociating PPP state to another session associated with the new call set-up message."

The court construed "session" to be "a PPP session."

The parties' agreed upon construction of "PPP Session" is "the time during which a communications device and a network access server are maintaining a negotiated PPP state."

The parties' agreed upon construction of "PPP State" is "a set of parameters negotiated pursuant to PPP sufficient for a PPP session."

Based on the parties' agreement at the claims construction hearing, the court construed "dormant" as "no active data transfer for a predetermined period of time allowing reallocation of resources, but from which active data transfer can resume more efficiently than it could from an inactive state."

Based on the parties' agreement at the claims construction hearing, the court construed "dormant PPP Session" as "a PPP session in a dormant state."

**C.    THE ST16**

Starent makes and sells a device called the ST16. It is undisputed that the ST16 can be configured to operate as a PDSN to connect a Mobile Device to a wireless network. When a Mobile Device first attempts data communication, it contacts the radio network and causes a device called a Packet Control Function ("PCF") to send a new call set-up message to a PDSN. When the ST16 receives such a new call set-up message from a PCF, it negotiates a PPP State to begin a PPP Session.

The parties dispute what occurs in the ST16 during an "intra-PDSN dormant call handoff" ("Dormant Call Handoff"). Starent contends that: 1) the ST16 maintains the same PPP

Session; 2) a PPP Session never goes "Dormant" in the ST16; 3) the ST16 always renegotiates PPP upon receipt of a new call set-up message; and 4) the ST16 does not associate PPP Sessions with Ports.  UTStarcom contends that: 1) the ST16 effectively has two PPP Sessions during a Dormant Call Handoff; 2) PPP Sessions do become Dormant in the ST16; 3) the ST16 does not always renegotiate PPP upon receipt of a new call set-up message; and 4) the ST16 associates PPP Sessions with specific Ports.

## IV.     DISCUSSION

### A.     THE MOTION IS NOT PREMATURE

Plaintiff argues this motion is premature, but fails to make any showing under Rule 56(f) that additional discovery would likely uncover evidence that could prevent summary judgment. *See Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d at 1161 n. 6.  Thus, this motion is ripe for decision.

### B.     UTSTARCOM HAS NOT PROFFERED EVIDENCE THAT WOULD SUPPORT A FINDING OF LITERAL INFRINGEMENT AS TO THE CLAIM LIMITATIONS OF A PPP SESSION GOING DORMANT, SWITCHING PPP STATE FROM ONE PPP SESSION TO ANOTHER PPP SESSION, AND PPP SESSIONS BEING ASSOCIATED WITH PORTS

Of the four issues specifically raised in Starent's motion, UTStarcom has raised a triable issue of material fact with at most one issue–whether or not the ST16 always renegotiates PPP upon receipt of a new call set-up message.  UTStarcom fails to raise a triable issue of material fact with regard to: 1) whether PPP Sessions go "Dormant" in the ST16; 2) whether the ST16 switches PPP State from one PPP Session to another PPP Session; and 3) whether PPP Sessions are associated with Ports in the ST16.

### 1.     UTStarcom Has Not Presented Any Evidence That PPP Sessions Ever Go "Dormant" in the ST16

One limitation of Claim 1 of the '671 Patent is the step of "initiating a Point-to-Point Protocol (PPP) session . . . . wherein said PPP session thereafter becomes dormant but . . ."  Starent contends that UTStarcom does not have evidence to show that PPP Sessions in the ST16

ever go "Dormant."[3]  The only "evidence" UTStarcom proffers in response is the declaration of

its expert, Paul Francis, PhD., who quotes one short excerpt from the 3GPP2 Standard:

> "49.    Starent claims that it does not infringe because PPP sessions in the ST 16 are never dormant and are always active.  I disagree.  The terms as construed describe a certain state, that of no active data transfer for a predetermined period of time allowing reallocation of resources, but from which active data transfer can resume more efficiently than from an inactive session.  This happens frequently in 3GPP2 networks so that radio resources can be reallocated to active users.  Indeed, the following excerpt from 3GPP2 describes three states for *packet data sessions*, active, dormant and inactive.  In the dormant state, the physical traffic channel (the radio resources) are torn down but the PPP link, and thus PPP state are maintained:

> "For purposes of the protocol of this standard, there are three *packet data session* states: Active/Connected, Dormant, and Null/Inactive.  In the Active/Connected State, at least one service instance is active and a physical traffic channel exists between the MS and the BS, and either side may send data on the active service instances.  In the Dormant State, all service instances are dormant and no physical traffic channel exists between the MS and the BS, but the PPP link between the MS and the PDSN is maintained.  In the Null/Inactive State, all service instances are in the Inactive/Null State and there is no traffic channel between the MS and the BS and no PPP link between the MS and the PDSN.

"Ex. I at UTS001466.

> "The physical traffic channel referred to above includes radio resources.  Thus, the 3GPP2 compliant ST16 participates in PPP sessions that become dormant.

> "50.    Starent's argument appears to be premised on the requirement that the ST16 itself decide whether a session is dormant, or that the ST16 reallocate resources.  However, I do not see that requirement in the claim.  Indeed, it is the radio network that determines whether dormancy has occurred because the scarce resources that drive the need for dormant PPP sessions are in the radio network not the PDSN."

Francis Decl.,[4] 11:16 – 12:10 (emphasis added).

The excerpt Francis cites from the 3GPP2 Standard discusses "packet data sessions" not

"PPP sessions."  Nowhere does UTStarcom establish that a "packet data session" under the

3GPP2 Standard qualifies as a "PPP Session" within the meaning of the asserted claims.  The

---

[3]    While it is not Starent's burden in this motion to proffer evidence that PPP Sessions do not go dormant in the ST16, it has done so.  (*See* Starent Networks Corp.'s Notice of Motion and Motion For Summary Judgment at 8:12-18 and 16:12-24.)

[4]    "Francis Decl." refers to the Declaration of Paul T. Francis, PhD. in Support of UTStarcom's Opposition to Starent's Motion for Summary Judgment.

3GPP2 Standard expressly distinguishes between "PPP sessions" and "packet data sessions."

The 3GPP2 Standard describes "PPP session"[5] as:

> "[T]he time during which a particular PPP connection instance is maintained in the open state in both the mobile station and the PDSN.  The PPP session is maintained during periods when the mobile station is dormant.  If a user hands off from one RN to another RN but is still connected to the same PDSN, the PPP session remains.  If a user changes PDSN, a new PPP session is created at the new PDSN."

McCauley Decl., Exh. S (Ennis Decl.,[6]) at Exh. C, UTS000972.

> In contrast, the 3GPP2 Standard describes "packet data session" as:

> "[A]n instance of continuous use of packet data service by the user.  A packet data session begins when the user invokes packet data service.  A packet data session ends when the user or the network terminates packet data service.  During a particular packet data session, the user may change locations but the same IP address is maintained.

> "For Simple IP service, moving from the coverage area of one PDSN to another PDSN constitutes a change in packet data session because a new IP address is assigned by the new PDSN.  For Simple IP service, a packet data session and a PPP session are concurrent.  For Mobile IP service, a packet data session can span several PDSNs as long as the user continuously maintains mobility bindings at the Home Agent and there is no lapse in Mobile IP registrations/re-registrations (i.e., the IP address is persistent).  *For Mobile IP service, the Packet Data session can exist through several changes of the PPP session.*"

McCauley Decl., Exh. S (Ennis Decl.,) at Exh. C, UTS000971-72 (emphasis added).

Thus, under the very standard with which UTStarcom alleges the ST16 complies, a "packet data session" is broader than a "PPP session" and the former can span *several* of the latter.  UTStarcom has shown, at most, that *packet data sessions* go dormant, not that *PPP sessions* go dormant.  Moreover, even with regard to packet data sessions, UTStarcom has not shown that they go "Dormant" as that term has been construed by the court.  The court construed "Dormant" as "no active data transfer for a *predetermined period of time*..."  See Claims

---

[5]    Dr. Francis has previously indicated that he does not consider the 3GPP2 Standard's definition of PPP Session (which Starent originally advocated using for purposes of claims contruction) to be substantially different than the definition the parties ultimately agreed upon. (*See* Declaration of Robert F. McCauley in Support of Defendant Starent Networks Corp.'s Motion for Summary Judgment ("McCauley Decl."), Exh Q (Francis 2/16/05 Decl.), ¶ 37.)

[6]    "Ennis Decl." refers to the Declaration of Gregory B. Ennis in Support of Defendant Starent Networks Corp.'s Opposition to Plaintiff UTStarcom, Inc.'s Motion for Preliminary Injunction.

Construction Order at 9:9-16.[7]  UTStarcom has presented no evidence, nor even any argument, regarding any *predetermined* period of time during which either the packet data sessions or the PPP sessions have no data transfer.[8]

Summary judgment as to literal infringement is warranted based solely on UTStarcom's failure to submit evidence sufficient to create a triable issue of material fact as to whether PPP Sessions go Dormant in the ST16.

### 2. Utstarcom Has Not Presented Any Evidence That the ST16 Switches PPP State From One PPP Session to Another PPP Session

Another limitation of Claim 1 of the '671 Patent is the step of "switching said PPP state from said dormant PPP session . . . . to a session . . ." The court construed the second reference to "a session" as "a PPP session," and the court construed "switching" as "shifting or reassociating PPP state to another session associated with the new call set-up message." Thus, as drafted, Claim 1 requires PPP state to be shifted or reassociated from one PPP session to *another* PPP session. Starent contends that UTStarcom does not have evidence to show that the ST16 switches PPP State from one PPP Session to another PPP Session.[9] Again, the only "evidence" UTStarcom proffers in response is the Francis Declaration, in which Dr. Francis states:

> "40. Each of the two *sessions* in the claim is identified by a given *time* period. There is a time period for the PPP session associated with the first port and another time period for the PPP session associated with the second port. Both PPP sessions use the same PPP state because the PPP state is switched between them. This is what happens in the ST16.

---

[7]     As used herein, "Claims Construction Order" refers to the Order Re: Claim Construction of United States Patent No. 6,628,671 filed herein on August 11, 2005.

[8]     Although Starent did not raise this specific issue in its moving papers, once Starent challenged UTStarcom's ability to prove infringement it was incumbent on UTStarcom to submit evidence sufficient to support a finding in its favor on that issue. The fact that Starent did not specifically articulate this specific deficiency in UTStarcom's evidence does not preclude the court from relying on this deficiency as alternate grounds for granting summary judgment. *See, e.g., Oddzon Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1407 (Fed.Cir. 1997) (upholding trial court's grant of summary judgment on grounds not raised by moving party).

[9]     While it is not Starent's burden in this motion to proffer evidence that its ST16 maintains a single PPP Session during a Dormant Call Handoff, and thus does not shift or reassociate PPP State from one PPP Session to another PPP Session, Starent has offered such evidence. (*See* Starent Networks Corp.'s Notice of Motion and Motion For Summary Judgment at 7:15-8:10.)

"41.    After a wireless device negotiates PPP state with the ST16, the first PPP session begins.  This PPP session continues for a period of time because PPP state is maintained.  Then, when dormancy occurs, the ST16 does not delete the PPP state information, but continues to store it in memory.  When the same user seeks to access the Internet from a different location (i.e., via a second port), the ST16 will switch PPP state information so that the user can access the Internet using the same PPP parameters.  Thus, begins the second PPP session – the time period when PPP state is maintained that is associated with the second port."

Francis Decl., 11:16 – 12:10.

Francis' conclusory declaration testimony is insufficient to create a triable issue of fact.  *See, e.g., Phillips Petroleum Co.*, 157 F.3d at 876.  Francis cites no actual evidence to support his claim that in the ST16 PPP State is "switched" between two PPP Sessions.  Nor does he explain *how* the ST16 purportedly "switches" the PPP state.  While couching his declaration in terms of facts, Francis is actually attempting to re-construe the term "PPP Session" to include a requirement that each PPP Session can be associated with only one port.  However, there is no such requirement in the agreed upon construction of the term PPP Session.  While Claims 1 and 2 do deal with situations where two PPP Sessions are associated with two different ports, that is a limitation of those claims, not part of the definition of PPP Session.

The agreed construction of PPP Session refers to "*the time* during which . . .," not "*any time period* during which . . .."  The use of the definite article "the" refers to a single cohesive time period – the *entire* time period during which "a communications device and a network access server are maintaining a negotiated PPP state."  UTStarcom has not presented any evidence that, during a Dormant Call Handoff, there are two distinct time periods during which both the ST16 and the Mobile Device[10] are "maintaining a negotiated PPP State," and that the ST16 switches PPP State between those two PPP Sessions.

Summary judgment as to literal infringement is warranted based solely on UTStarcom's failure to submit evidence sufficient to create a triable issue of material fact as to whether the

---

[10]    In addition, UTStarcom presents *no* evidence–conclusory or otherwise–from which a reasonable jury could find that a *Mobile Device* "maintains PPP State" during any portion of a Dormant Call Handoff in the ST16.  The Francis Declaration indicates only that PPP State is stored *in the ST16*.  (Francis Decl., 7:25-26 and 10:7-8).  Neither UTStarcom nor its expert mention what, if anything, is "maintained" in the Mobile Device.  This omission alone is sufficient to warrant summary judgment, because the burden was on UTStarcom to come forward with evidence to support a finding that *every* limitation in the asserted claims is met.

ST16 switches PPP State between two PPP Sessions.

### 3. UTStarcom Has Not Presented Any Evidence That PPP Sessions Are Associated with "Ports" in the ST16

Another limitation of Claim 1 of the '671 Patent is the step of "switching said PPP state from said dormant PPP session *associated with said first port* to a session associated with said new call set-up message *associated with said device at said second port*" ('671 Patent, at 19:1-4) (emphasis added). Starent contends that UTStarcom does not have evidence to show that PPP Sessions are associated with Ports in the ST16.[11]  In response, UTStarcom points out that during claims construction the court recognized the term "Port" could include logical connections made via software. UTStarcom again relies solely on the Francis Declaration, in which he states:

> "67.    As I stated in my prior declaration in connection with the motion for preliminary injunction, the R-P session between a PCF and PDSN is a logical connection.  However, to be more precise, within the PDSN, the logical connection is implemented in software.  The combination of the software and its associated memory that processes the incoming and outgoing packets is the logical connection–the port–through which data enters and leaves the PDSN.  Each R-P session can be identified by specific information that is saved in the ST16.  Part of that information is data that identifies the particular PCF and wireless user.  By specifically identifying each R-P session in the ST16 software, the software can direct incoming messages so that they reach the intended target.

> "68.    Only by associating each PPP session with a unique port can the ST16 differentiate the thousands of packets that flow in and out of the ST16.

> "69.    The software port acts as an entry and exit point because until the PPP [sic]"

Francis Decl., 15:17–28.

Again, Francis' conclusory declaration testimony[12] is insufficient to create a triable issue of fact. *See, e.g., Phillips Petroleum Co.*, 157 F.3d at 876.  Francis cites no actual evidence to

---

[11]    While it is not Starent's burden in this motion to proffer evidence that PPP Sessions are not associated with Ports in the ST16, it has done so.  (*See* Starent Networks Corp.'s Notice of Motion and Motion For Summary Judgment at 9:20-27.)

[12]    In this instance, Francis' testimony is also inconsistent. He first states that a logical connection is implemented in software "within the PDSN," and then claims that somehow that logical connection is the "port" through which data enters and leaves the PDSN.  However, for the data to arrive at a logical connection "within" the PDSN, the data must have already entered the PDSN. Thus, the logical connection "within" the PDSN cannot be the port through which data enters the PDSN.

support the contention that the ports in the ST16 are logical connections.[13]  The court's

determination that the term "Port" in Claim 1 of the '671 Patent *can* include logical connections

does not mean that *all* logical connection are "Ports" within the meaning of the claims.  To be a

"Port" within the meaning of the Claim 1, a logical connection must be the means by which data

enters or leaves the network device.  UTStarcom has offered no evidence from which a

reasonable jury could find that any logical connections associated with PPP Sessions in the ST16

are "Ports" within the meaning of the asserted claims.

Summary judgment as to literal infringement is warranted based solely on UTStarcom's

failure to submit evidence sufficient to create a triable issue of material fact as to whether PPP

Sessions are associated with Ports in the ST16.

### C.   UTSTARCOM HAS NOT SHOWN INFRINGEMENT OF THE '671 PATENT UNDER THE DOCTRINE OF EQUIVALENTS

### 1.   "Not Dormant" Cannot Be the Equivalent of "Dormant" under the Doctrine of Equivalents

UTStarcom argues that a PPP Session that is not dormant is substantially the same as a

dormant PPP Session.  However, finding "not dormant" to be the equivalent of "dormant" would

violate the "all elements rule" because it equates a claim limitation with its own opposite, thus

entirely vitiating that limitation.  *See Asyst Techs., Inc. v. Emtrak, Inc.*, 402 F.3d at 1195 (holding

"unmounted" could not be the equivalent of "mounted on"); *and Moore U.S.A., Inc. v. Standard

Register Co.*, 229 F.3d at 1106 (holding that a minority could not be the equivalent of a

majority).  Summary judgment of noninfringement under the doctrine of equivalents is warranted

for this reason alone.

### 2.   UTStarcom Is Precluded from Arguing That Maintaining One PPP Session Is Equivalent to Switching Between Two PPP Sessions under the Doctrine of Equivalents

In its moving papers, Starent pointed to numerous items of prior art that teach a method

where a single PPP session is kept open when a call goes from an active to a dormant state.  One

in particular, the TIA IS-707 standard, discloses all the elements of Claim 1, with the exception

---

[13]    Starent's evidence includes testimony that the ports on the ST16 are *physical* plugs, and that the ST16 can be configured as a PDSN with a minimum of just one such port. (*See* McCauley Decl., Exh. M at 52:2 through 53:9.)

of switching PPP State between two PPP Sessions.  (*See,* McCauley Decl., Exh. N. (Perkins Decl.), ¶¶ 29-36 and Exh. G thereto.)  UTStarcom itself highlighted this sole distinction in responding to Starent's invalidity contentions in connection with UTStarcom's motion for preliminary injunction.  (*See,* McCauley Decl., Exh. Q (Francis 2/16/05 Decl.), ¶¶ 80-81.)  Thus, equating the maintenance of a single PPP session with switching between two PPP sessions would impermissibly allow the '671 Patent to read on the prior art.  *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1367 (Fed.Cir. 1999) (doctrine of equivalents "cannot allow a patent to encompass subject matter existing in the prior art").

UTStarcom's opposition failed to respond to Starent's showing regarding the prior art, other than a general assertion that the parties' pre-claims-construction contentions are somehow irrelevant.  However, as Starent points out, the court's claims construction did not change the definition of "PPP Session."  UTStarcom has not explained how the descriptions of the prior art are in any way eclipsed by the Claims Construction Order.

At oral argument, UTStarcom attempted to distinguish the prior art by claiming that under the prior art if a Mobile Device moved from one PCF to another PCF the PPP state would be renegotiated.  UTStarcom failed to direct the court's attention to any evidence to support this contention regarding the prior art.[14]  Moreover, nothing in Claim 1, as construed by the court, requires the Mobile Device to move from one PCF to another PCF. Claim 1 requires only that a "new call set-up message" arrive "at a second port in said network access server."  (*See* '671 Patent, 18:65-67.)  Thus, finding infringement under the doctrine of equivalents where a method maintains one PPP Session rather than switching between two PPP Sessions would impermissibly bring prior art within the coverage of Claim 1 of the '671 Patent.  If using a single PPP Session cannot be considered a substantial equivalent for purposes of Claim 1, it also cannot

---

[14]  The court has not examined the file to determine whether there is any evidence in the record to support UTStarcom's contention regarding the prior art; it was incumbent upon UTStarcom to direct the court's attention to any such evidence.  *See, Carmen v. San Francisco Unified School District*, 237 F.3d 1026 (9th Cir. 2001) ("The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found.")

1  be considered a substantial equivalent for purposes of dependent Claim 2.[15]

2      UTStarcom's failure to establish a legally viable equivalent exists in the ST16 for the

3  claim element of switching between two PPP Sessions is sufficient grounds for granting

4  summary judgment of noninfringement under the doctrine of equivalents.

5      **3.    UTStarcom Has Not Shown That Associating a PPP Session with Particular
           Data Stored in Memory in the ST16 Is the Equivalent of the Condition of a
6           PPP Session Being Associated with a Port**

7      UTStarcom fails to show that the act of associating a PPP Session with particular data

8  stored in memory in the ST16 is the equivalent of the condition of a PPP Session being

9  associated with a Port as set forth in Claim 1.  To begin with, UTStarcom has not directed the

10 court's attention to any evidence from which a reasonable jury could find that the ST16 actually

11 does associate PPP Sessions with particular data stored in memory.

12     Moreover, UTStarcom has not shown that associating a PPP Session with data stored in

13 memory in the ST16 has substantially the same function, means and result as PPP Sessions being

14 associated with a Port.  *See Graver Tank*, 339 U.S. at 608-9 (doctrine of equivalence requires

15 showing of substantial identity of function, means, and result).  In an attempt to make this

16 showing, UTStarcom essentially conflates the showing to the overall purpose and result of

17 Claims 1 and 2, rather than focusing on the specific claim limitation of a PPP Session being

18 associated with a Port.  However, in evaluating whether an accused device or method performs

19 substantially the same function, by substantially the same means, and obtains substantially the

20 same result, the relevant analysis must take account of "the role played by *each element* in the

21 context of the specific patent claim."  *See Boehringer Ingleheim v. Schering-Plough Corp.*, 320

22 F.3d 1339, 1351 (Fed.Cir. 2003) (emphasis added).

23     The context of the '671 Patent forms the background against which the role played by

24 each element must be evaluated.  *See, Ibid.*  The condition of a PPP Session being associated

25 with a particular port was an inherent part of the technology the '671 Patent was geared to

26

27     [15]   Claim 2 is prefaced with the words "The method of claim 1, wherein . . . ."  The
28 claim language regarding switching PPP State from one PPP Session to another PPP Session is
   found only in Claim 1.  Thus, in order to be considered a legally viable equivalent for Claim 2,
   any substantial equivalent must be a legally viable equivalent for purposes of Claim 1.

1    address.  The'671 Patent was designed to solve the problem of how to take a previously

2    negotiated PPP State for a PPP Session associated with the first port a call came in on from a

3    Mobile Device, and transfer it to a new PPP Session created when the call came in again through

4    a different port.

5        Against that background, as the court has construed the terms of the claims, the role

6    played by a PPP Session being associated with a Port is simply that of data entering a network

7    access server through a particular Port.  The means by which the data enters the network access

8    server through a particular Port is by being transmitted to the network access server by a Mobile

9    Device in such a way that it arrives at, and enters through, the particular Port.  The result is that

10   the data is available to the network access server only through that particular Port.  UTStarcom

11   has not shown that associating a PPP Session with data stored in memory plays these same roles

12   in the ST16.

13       Specifically, UTStarcom has not shown, nor even asserted, that associating a PPP Session

14   with data stored in memory in the ST16 serves the function of data entering a network access

15   server through a particular Port.  Instead, UTStarcom asserts that the function of associating a

16   PPP Session with data stored in memory is "to differentiate the data packets that flow into and

17   out of the ST16 with a particular user and session."  However, in Claim 1 of the '671 Patent that

18   function is performed by the limitation "receiving, after said PPP session has become dormant, at

19   said network access server *a new call set-up message associated with said device. . . ."  (See* '671

20   Patent at 18:63-65 (emphasis added)).  Thus, the function of associating a PPP Session with data

21   stored in memory in the ST16 is substantially *different* from the function of PPP Sessions being

22   associated with Ports for purposes of Claim 1 as construed by the court.

23       Second, even if the function was deemed to be substantially the same, UTStarcom has not

24   shown that it is accomplished by substantially the same means.  UTStarcom's entire showing in

25   this regard is the statement of its expert that:

26        "Starent's ST16 performs this function by associating each PPP session with
          particular information stored in memory.  Thus, like the claim, the ST16 makes an
27        association that allows data to transfer via a PPP session."

28   The first sentence simply restates what the claimed equivalent element is.  The second sentence

impermissibly attempts to imply the "means" or "way" based on the result.  *See, e.g., Universal Gym Equipment, Inc.*, 827 F.2d at 1548 ("fact that the two devices achieve substantially the same result creates no presumption that they do so in substantially the same way").  Nowhere does UTStarcom actually explain the means by which the ST16 performs the function of "differentiating between data packets that flow into and out of the ST16 with a particular user and session," nor how that is substantially the same as data being transmitted by a Mobile Device to the network access server through a particular Port.

Finally, UTStarcom has not shown that the purported equivalent has substantially the same result as this claim element.  UTStarcom does not contend that the result of associating a PPP Session with data stored in the memory of the ST16 is to make data available to the network access server through only one particular Port.  Instead, UTStarcom contends the result of associating a PPP Session with data stored in the memory of the ST16 is that data packets are forwarded to the correct PCF and ultimately the correct user.

Thus, no reasonable juror could find that, in the context of Claim 1 as construed by the court, the act of associating a PPP Session with particular data stored in memory in the ST16 is the substantial equivalent of the condition of a PPP Session being associated with a Port.  Summary judgment of noninfringement under the doctrine of equivalents is warranted on this ground alone.

### D. EVEN ASIDE FROM THE SPECIFIC POINTS RAISED BY STARENT IN THIS MOTION, UTSTARCOM FAILED TO PROFFER SUFFICIENT EVIDENCE FROM WHICH A REASONABLE JURY COULD FIND INFRINGEMENT OTHER THAN, AT MOST, A FEW INSTANCES OF TESTING

Even if the court were to find UTStarcom raised triable issues of fact with regard to the specific points discussed in Starent's brief, UTStarcom failed to submit sufficient evidence from which a reasonable jury could find Starent liable for either direct infringement (other than, at most, a few instances of testing) or indirect infringement.  Its evidence as to direct infringement is deficient because it proffered no evidence that, other than the few instances of testing, Starent itself engages in the patented method.  Its evidence as to indirect infringement is deficient because it proffered no evidence that there are no substantial non-infringing uses of the ST16,

nor that Starent actively and knowingly induced others to engage in the patented method.  The fact that Starent did not specifically articulate these specific deficiencies in UTStarcom's evidence does not preclude the court from relying on them as alternate grounds for granting summary judgment.  *See, e.g., Oddzon Prods., Inc.*, 122 F.3d at 1407.

### 1.   UTStarcom Failed to Submit Sufficient Evidence from Which a Reasonable Jury Could Find *Direct* Infringement, Other than at Most a Few Instances of Testing

UTStarcom does not contend, and has offered no evidence to show, that Starent itself makes or sells Mobile Devices.  Instead, UTStarcom focuses on the functioning of Starent's product when it is used in conjunction with *a third party's* Mobile Device.  UTStarcom has submitted a few documents related to Starent's testing of the ST16, which supposedly involved using a Mobile Device.  (While UTStarcom did not argue in its opposition brief or at oral argument that this constituted direct infringement, it did make this claim in its motion for preliminary injunction.)

Thus, even if the court were to find triable issues of fact on the points raised by Starent, at a minimum partial summary judgment limiting this case to the few instances of testing reflected in UTStarcom's evidence would be warranted.

### 2.   UTStarcom Failed to Submit Sufficient Evidence from Which a Reasonable Jury Could Find *Indirect* Infringement

To prove indirect infringement, UTStarcom has the burden to either: 1) establish contributory infringement by showing that the ST16 has no substantial non-infringing uses; or 2) establish inducement of infringement by showing that Starent took actions that actually induced direct infringement by others, and that Starent knew or should have known that such actions would induce direct infringement.  *See Golden Blount, Inc.*, 365 F.3d at 1061.

UTStarcom has not even attempted to establish that the ST16 has no substantial non-infringing uses.[16]  Thus, UTStarcom has failed to proffer evidence from which a reasonable jury

---

[16]    UTStarcom alleges only that the ST16 "can" be configured in a way that infringes the '671 Patent. (*See, e.g.*, UTStarcom's Amended Complaint for Patent Infringement and Demand for Jury Trial, ¶¶ 18 & 20; *see also*, UTStarcom's Infringement Contentions, dated 9/12/05, attached as Exh. E to the McCauley Decl., at 2:22)  And UTStarcom failed to submit

1   could find Starent liable for contributory infringement.

2       Nor does UTStarcom direct the court's attention to any evidence that Starent took any

3   actions that actually induced direct infringement by others, and that it knew or should have

4   known its actions would induce direct infringement.  Thus, UTStarcom has failed to proffer

5   evidence from which a reasonable jury could find Starent liable for inducing infringement.

6

7   **V.    CONCLUSION**

8       UTStarcom patented a specific method of maintaining PPP State during a Dormant Call

9   Handoff.  It is now essentially attempting to expand its patent rights to cover *all* methods of

10  maintaining PPP State during a Dormant Call Handoff.  Such an expansion of patent rights is not

11  allowed under the patent laws.

12      In sum, UTStarcom has not shown that the specific facts it has set forth, coupled with

13  undisputed background or contextual facts, "are such that a rational or reasonable jury might

14  return a verdict in its favor based on that evidence" on the issue of infringement.  *See T.W. Elec.*

15  *Service,* 809 F.2d at 630-31.  Summary Judgment of non-infringement is thus warranted.

16  Dated: *12/6/05*

17                          *Patricia V. Trumbull*

18                          PATRICIA V. TRUMBULL
                            United States Magistrate Judge

19

20

21

22

23

24

25

26

27

28  any evidence contrary to the testimony submitted by Starent indicating that the ST16 can be
    configured with a minimum of one port.  Since Claim 1 requires *second* Port, the undisputed
    evidence shows that the ST16 has non-infringing uses.